CARLSON, Presiding Justice,
for the Court:
¶ 1. Walter Akins d/b/a Akins Construction Company (Akins) filed suit in the Circuit Court of Oktibbeha County against Golden Triangle Planning and Development District, Inc. (Golden Triangle) under the theory of respondeat superior, seeking, inter alia, $80,628, an amount that he claimed represented profits owed to him for constructing homes under the federal government’s HOME Investment Partnerships Program (HOME), which was administered locally by Golden Triangle. According to Akins, the profits to which he was entitled were embezzled by a Golden Triangle employee, Phyllis Tate. Upon both parties filing motions for summary judgment, the trial court denied Akins’s motion for summary judgment and granted summary judgment in favor of Golden Triangle. Consistent with these actions, the trial court entered final judgment in favor of Golden Triangle, thus dismissing Akins’s claims with prejudice. Aggrieved by the trial court’s judgment, Akins timely filed this appeal.
*577 FACTS AND PROCEEDINGS IN THE TRIAL COURT
¶ 2. Golden Triangle is a nonprofit economic-development corporation headquartered in Starkville. Golden Triangle serves the counties of Choctaw, Clay, Lowndes, Noxubee, Oktibbeha, Webster, and Winston. One of the programs managed by Golden Triangle is the HOME program, which is under the auspices of the Department of Housing and Urban Development (HUD). The HOME program is aimed at providing affordable housing for rent or ownership to low-income individuals. Within Golden Triangle’s Community Enrichment Division is the Housing Department, and, at all relevant times herein, Phyllis Tate (Tate) was employed by Golden Triangle as a Housing Specialist within the Housing Department. Tate’s duties included enrolling the seven participating counties in the HOME program; assisting counties and municipalities in selecting eligible participants; advertising and soliciting bids from third-party contractors to construct the houses; verifying that the most competitive participants were awarded the bids; reviewing inspector reports certifying percentage of work completed on houses; and submitting requests to the Mississippi Development Authority for disbursement of money to counties and municipalities for payment to the contractors.
¶ 3. In general, the process began with Tate assisting the counties and municipalities in applying for HOME funds. For those applications which were approved, the HOME funds were allocated to the counties and municipalities. Tate worked with potential homeowners to select house plans and general contractors. The future hoineowners then contracted with the builders, and these contracts ultimately had to be approved by Golden Triangle. When building began, Tate received invoices from contractors and requested cash allotments from the counties and municipalities, which, in turn, paid the invoices with HOME funds.[1]
¶ 4. Eventually, Tate began a scheme in which she colluded with her daughter and her daughter’s then-boyfriend, Jason Clark, to divert HOME funds by transferring profits from the building projects to the checking account of a shell corporation, J-Max Construction Company, purportedly owned by Clark. In reality, J-Max was created for the fraudulent purpose of receiving the illegally diverted HOME funds. Tate convinced future homeowners to contract with builders with whom she purportedly had been working. Tate then requested cash allotments for J-Max Construction Company. The county or municipality receiving the grant funds wrote checks to J-Max. Tate, Clark, or Tate’s daughter would withdraw the necessary funds to pay the subcontractors. When building was complete, Tate incorporated into the withdrawals the profits which should have been paid to the general contractor who actually had performed the work.
¶ 5. Akins was one of the general contractors who built homes under the HOME program administered by Golden Triangle. Akins was paid a total of $820,000 with HOME funds for various construction projects. Akins contracted with prospective homeowners to construct their residences. Golden Triangle approved these contracts. Akins requested *578 periodic payments and a final payment upon completion. At Golden Triangle’s request, Akins was paid for his services.
¶ 6. In August 2005, Golden Triangle suspected that Tate and/or Akins was involved in fraudulent activity after learning that Akins was charging building supplies to an account opened by Tate on behalf of a county at an area building supply warehouse, thereby avoiding sales tax on the building supplies. A forensic certified public accountant, hired by Golden Triangle, investigated and determined that Tate was embezzling HOME funds.
¶ 7. Upon receiving this information from the forensic CPA, Golden Triangle reported Tate’s actions to the local district attorney, the Mississippi State Auditor, and the Mississippi Development Authority. In due course, the Federal Bureau of Investigation conducted its own investigation, ultimately resulting in a forty-seven-count federal grand jury indictment being handed down in the United States District Court for the Northern District of Mississippi. Some of the overt acts asserted by the government in this indictment were as follows:
3. PHYLLIS TATE created fraudulent requests for cash purportedly for J-Max Construction Company, a company supposedly building low income housing in Weir, Webster County, Choctaw County, Eupora, Winston County, Oktibbeha County, Macon, and Noxubee County, Mississippi.
4. J-Max Construction Company received funds for low income housing it did not build, but funds provided by the Housing and Urban Development Administration were nevertheless paid as a result of the fraudulent requests for cash.
5. J-Max Construction was purportedly a construction company operated by JASON CLARK, KEINA TATE’S then-boyfriend. The company and its checking account were created for no reason other than to funnel money designated to build low income housing into the pockets of JOSH BROWN, JASON CLARK, KEINA TATE, and PHYLLIS TATE.
6. KEINA TATE and JASON CLARK were the only individuals with signatory authority for J-Max Construction’s checking account, and once the funds from the town, city, or county were deposited into the account either KEINA TATE or JASON CLARK would withdraw a portion of those funds and transfer them to PHYLLIS TATE either by paying her cash or transferring it to one of PHYLLIS TATE’S personal accounts, including, but not limited to, PHYLLIS TATE’S Curry Club account, a non-business account in Phyllis Tate’s maiden name. KEINA TATE and JASON CLARK also retained a portion of the funds deposited into the J-Max Construction account.
7. At times pursuant to the dictates of the program, cash may not be distributed without an inspector providing information related to the progress of the construction. To make certain the fraudulent cash requests were honored, JOSH BROWN would provide fraudulent building inspection statements, stating that he had inspected the particular homes when he had not done so. On more than one occasion JOSH BROWN provided statements that construction of particular homes had progressed to a stage that would allow additional disbursements when in fact the structure was not yet started. JOSH BROWN received payment from the funding at issue for each fraudulent statement he *579 provided.[2]
¶ 8. On December 12, 2006, Akins filed suit against Golden Triangle in the Circuit Court of Oktibbeha County. In his complaint Akins alleged that the amount of $80,628 was embezzled by Tate, but actually owed to him for his services, and that Golden Triangle was vicariously liable under the doctrine of respondeat superior.[3] Akins alleged that payments made to J-Max were for construction that he completed.
¶ 9. In due course, both Akins and Golden Triangle filed motions for summary judgment. The Circuit Court of Oktib-beha County, Judge Lee J. Howard presiding, denied Akins’s motion for summary judgment and granted Golden Triangle’s motion for summary judgment on the grounds that Tate was acting outside the scope of her duties in stealing government money and that Golden Triangle did not receive any benefit from Tate’s illegal actions. From the trial court judgment entered in favor of Golden Triangle, Akins appeals to us.
DISCUSSION
1110. Akins presents to us the single issue of whether the circuit court erroneously granted Golden Triangle’s motion for summary judgment.
¶ 11. A motion for summary judgment shall be granted “if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Miss. R. Civ. P. 56(c). A grant of summary judgment is reviewed by this Court under the de novo standard. Weathers v. Metropolitan Life Ins. Co., 14 So.3d 688, 691 (Miss.2009) (quoting Bullard v. Guardian Life Ins. Co. of Am., 941 So.2d 812, 814 (Miss.2006)).
The court views the evidence in the light most favorable to the nonmoving party. Univ. of Miss. Med. Ctr. v. Easterling, 928 So.2d 815, 817 (Miss.2006). “The moving party bears the burden of demonstrating there is no genuine issue of material fact.” Id. This Court also has held that “[w]here there is doubt whether a fact issue exists, the non-moving party is the beneficiary of that doubt.” Allen v. Mac Tools, Inc., 671 So.2d 636, 640 (Miss.1996).
Weathers, 14 So.3d at 691.
¶ 12. Akins maintains that Golden Triangle is liable because the embezzlement was committed in the scope of Tate’s employment. Golden Triangle argues that the acts committed by Tate were committed in furtherance of her own personal gain and not for the benefit of Golden Triangle or in the scope of her employment.
*580 ¶ 13. The trial court relied on the test[4] in Commercial Bank v. Hearn, 923 So.2d 202 (Miss.2006), for determining whether an employee was acting within the scope of employment. In Hearn, this Court defined an employee’s conduct as being in the scope of employment if:
(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master, and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
Id. at 208 (citing Marter v. Scott, 514 So.2d 1240, 1242-43 (Miss.1987); Restatement (Second) of Agency § 228 (1958)). “Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.” Id.
¶ 14. The trial court found that Tate was employed for the purpose of transferring money from government entities into the accounts of builders. The trial court did not believe this scope of employment included stealing government money and routing it into her own personal account. Thus, according to the trial court, Tate’s conduct satisfied only one prong of the Hearn test, inasmuch as the illegal acts occurred during the time she was working at Golden Triangle; however, Golden Triangle received no benefit from Tate’s actions.
¶ 15. The facts in Hearn are as follows: A bank employee was involved in an automobile accident that resulted in the injury of another driver and the death of an infant passenger. Id. at 203. The accident occurred during the employee’s work hours while the employee was soliciting pledges for a United Way Campaign. The injured parties filed suit against both the employee and the bank based on the theory of respondeat superior. Id. at 204. This Court found that soliciting pledges was neither an act within the scope of employment nor an act conducted in furtherance of any benefit to the bank; thus, the trial court’s judgment denying Commercial Bank’s motion for summary judgment was reversed and rendered. Id. at 208-210.
¶ 16. The second case the trial court cited was Berhow v. The People’s Bank, 423 F.Supp.2d 562 (S.D.Miss.2006). In Berhow, a loan officer fraudulently used bank customers’ information to create fictitious loans and obtain funds for himself. One of the customers filed suit against the bank arguing that the bank was vicariously liable for its officer’s actions. The trial court rejected this argument on the basis that the employee’s fraud was for his own gain and of no benefit to the bank and that stealing funds from the bank was not within the scope of his employment. Id. at 575.
¶ 17. Akins argues that both of these cases concern employees involved in “an entirely personal act” and that such is not the case here. Akins alleges that Tate was acting within the scope of her duties in approving the disbursement of monies and building homes. Moreover, Akins alleges that Tate diverted Akins’s money to the J-Max account, paid subcontractors, and then kept Akins’s profits for herself and her co-conspirators. Thus, according to Akins, Tate was still ensuring that the homes were built, which acts, at least in part, served the master.
*581 ¶ 18. Akins compares the facts of the present case with the facts in Billups Petroleum v. Hardin’s Bakeries Corp., 217 Miss. 24, 63 So.2d 543 (1953), wherein a salesman was overcharging Billups for bread and keeping the difference for himself. Hardin’s was found liable for its employee’s theft. Id. at 548. Akins further cites Napp v. Liberty National Life Insurance Co., 248 Miss. 320, 159 So.2d 164 (1963), wherein an insurance agent pocketed half of a beneficiary’s dividends under a $1,000 life insurance policy with a double-indemnity clause in the event of accidental death. Id. at 164. The decedent had died in an automobile accident, and the decedent’s widow was the beneficiary. Id. The insurance agent convinced the beneficiary that the policy had lapsed but that the company would pay her $1,000 under the policy. Id. at 165. When the agent presented her with a $2,000 check from the life insurance company, he persuaded her that this was an oversight and that she would be required to deposit $1,000 in her account, but give $1,000 dollars in cash back to the agent. Id. The company was held liable for the difference. Id. at 166.
¶ 19. Golden Triangle contends that Akins’s reliance on both Billups and Napp is misplaced, as these decisions have been eroded by more recent Mississippi Supreme Court decisions which have demonstrated a “marked shift away from expansive employer vicarious liability.” Golden Triangle cites Gulledge v. Shaw, 880 So.2d 288 (Miss.2004), for the premise that when “a servant, having completed his duty to his master, then proceeds to prosecute some private purpose of his own, the master is not liable....” Id. at 295. Golden Triangle further argues that Akins has failed to prove that he is owed any of the funds diverted by Tate to J-Max, and in turn, to herself and her co-conspirators. Alternatively, Golden Triangle maintains that, even if the facts averred by Akins are true, Golden Triangle still is entitled to judgment as a matter of law because Tate acted outside her duties for her own gain to the detriment — not the benefit — of her employer/master, Golden Triangle.
¶ 20. From the record before us, we find that the trial court did not err in granting Golden Triangle’s motion for summary judgment, notwithstanding that genuine issues of fact exist, because Akins’s claims fail as a matter of law. The trial court was correct in finding that Tate’s misdeeds were for her own personal gain and were of no benefit to Golden Triangle. She took government money and funneled it into the J-Max account. Later, this money was put into Tate’s personal account. Even if this money was earmarked for Akins, as a matter of law, Akins cannot be granted relief under a theory of respondeat superior. Given that Akins contracted with the homeowners themselves, and there exists no privity of contract between the parties, Akins is not entitled to relief from Golden Triangle.
CONCLUSION
¶ 21. As a matter of law, Akins was not entitled to recover any funds from Golden Triangle, given that Golden Triangle’s employee, Tate, embezzled money for her own personal gain and did not serve to mutually benefit Golden Triangle. Rather, such actions were to the detriment of Golden Triangle. For all the reasons stated, the trial court did not err in granting Golden Triangle’s motion for summary judgment; therefore, the Oktibbeha County Circuit Court’s final judgment entered in favor of Golden Triangle Planning & Development District, Inc., dismissing with prejudice all claims of Walter Akins d/b/a Akins Construction Company, is affirmed.
¶ 22. AFFIRMED.
*582 WALLER, C.J., GRAVES, P.J, KITCHENS AND PIERCE, JJ., CONCUR. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, LAMAR AND CHANDLER, JJ.

. As can be presumed from this recitation of the facts, numerous contracts/documents most likely exist to memorialize the duties and obligations of Golden Triangle in its relationship with HUD and the duties and obligations of the general contractors in their relationships with Golden Triangle and the individual homeowners; however, none of these documents appear in the appellate record before us in this case.

. Eventually, Tate pleaded guilty in the United States District Court for the Northern District of Mississippi, Chief Judge Michael P. Mills presiding. Pursuant to a plea agreement, Tate pleaded guilty to Count 47 of the indictment, which asserted, inter alia, that Tate had conspired with Brown, Clark and Keina Tale to illegally convert federal funds for "the use of persons other than the rightful owner.” From the record before us, we are unable to decipher what sentence was ultimately imposed upon Tate by Judge Mills.

. Notwithstanding the dissent’s discussion, we have focused our discussion on the issue as couched in the parties' appellate briefs, that being whether damages are recoverable in today's case on the theory of respondeat superior. Mississippi Rule of Appellate Procedure 28(a)(6) states that "[t]he argument [in the brief] shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on.”

. The trial court opinion referred to a "three prong” test from Hearn, and erroneously omitted the fourth prong when citing to Hearn.